# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **WANDA JURRIAANS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **CASE NO. 3:17-cv-00124-WKW-WC** |
| | ) |
| **ALABAMA COOPERATIVE** | ) |
| **EXTENSION SYSTEM, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## DEFENDANTS' OBJECTION AND MOTION TO STRIKE AFFIDAVITS AND OTHER EVIDENCE

Defendants Auburn University, the Alabama Cooperative Extension System ("ACES"), Dr. Paul Brown, Dr. Gary Lemme, Dr. Kyle Kostelecky, Ms. Chris McClendon, and Mr. Stanley Windham (hereinafter collectively, "Defendants" or "Auburn") object to and move the Court to strike the following exhibits offered by Plaintiff Wanda Jurriaans in her *Submission of Exhibits in Opposition to Defendant's Motion for Summary Judgment* (doc. 87) and to strike all corresponding references in Plaintiff's brief in opposition (doc. 86) to such exhibits:

| EXHIBIT | DESCRIPTION |
|---|---|
| A | • Affidavit of Yvonne Bowens-Thomas with attached EEOC Charge of Discrimination |
| B | • Certification and Acknowledgement of Ann Wilson, with affidavit attached |
| C | • Certifications and Acknowledgements of Joseph Whitfield and Laura Whitfield, with affidavit attached |
| D | • Certifications and Acknowledgements of Courtney Panneton and Laura Panneton, with affidavit attached |
| E | • Notarized Written Statement of Cathy Sorrell |

| G | • Affidavit of Wanda Jurriaans |
|---|---|
| H | • Charge of Discrimination – Margaret Odom; EEOC Charge No. 420-2018-01597; affidavit attached |
| J | • Charge of Discrimination – Melanie Allen; EEOC Charge No. 420-2018-02142; affidavit attached |
| K | • Charge of Discrimination – Wanda Carpenter; EEOC Charge No. 420-2018-02185; affidavit attached |
| L | • Charge of Discrimination – Sallie Hooker; EEOC Charge No. 420-2018-01673; affidavit attached |

## **The Affidavits and Exhibits are Not Proper on Summary Judgment**

1.   The affidavits and exhibits to which objection is made contain improper conclusions and opinions which the affiants are not qualified to state, inadmissible hearsay, and assertions made without personal knowledge.

2.   The affidavits contain improper conclusions in numerous paragraphs, including the following:[1]

| Ex. | Affiant | Improper Conclusions/ Opinions | Affidavit Testimony Excerpts |
|---|---|---|---|
| A | **Yvonne Bowens-Thomas** | ¶ 2 | 2. "… I was being bullied, harassed, and retaliated against because of my race and/or my complaints about race discrimination." |
| | | ¶ 3 | 3. "Mr. Windham's reaction to me was typical. He was already very distant, not 'hands-on,' and always very insensitive and unhelpful to me as a County Coordinator. That pattern of behavior continued even after I was reassigned to an Agent II position with Montgomery County." |
| | | ¶ 4 | 4. "I always found Ms. Jurriaans to be very friendly, outgoing, and positive. She was a real 'people person'…" |

---

[1] For ease of reference, highlighted copies of these affidavits which display the cited portions of each referenced paragraph referenced herein are included as **Exhibits 1-6** to this motion.

258938.1

| Ex. | Affiant | Improper Conclusions/ Opinions | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | ¶ 7 | 7. "... Mr. Windham did not like independent thinkers like Ms. Jurriaans, me, and others. He always insisted on his own opinion, even when he lacked evidence or research-based information to support his position." |
| | | ¶ 8 | 8. "My conclusion is that Stan Windham lacked the experience, knowledge, skills, and ability to effectively supervise county extension coordinators. Mr. Windham's deficiency was especially noticed when compared to previous district extension coordinators in Mr. Windham's job...." |
| | | ¶ 9 | 9. "The reason I didn't go to Kelly Taylor of Auburn's EEO office is that she and her office always had the reputation of only supporting Auburn University. In fact, among ACES employees who had dealings with Ms. Taylor and her office, Ms. Taylor and her assistants were always known for siding with Auburn University and for getting ACES employees to divulge information they could use against ACES employees in defending Auburn and ACES." |
| B | Ann Wilson | p. 3 | "[Ms. Jurriaans] strives to treat everyone the same. She has been nothing but helpful to people especially those that participate in the ACES." |
| | | p. 3 | "Since Ms. Jurriaans' termination, there has been no more activities nor communication from the ACES" |
| C | Joseph Whitfield & Laura Harris Whitfield | ¶ 3 | 3. "We were not comfortable with Kim Good, the person we believed was over the 4-H program." |
| | | ¶ 12 | 12. Ms. Jurriaans "has been integral in helping the Agricultural (animal and plant systems) program to gain its Business Industry Certification...." |
| | | ¶ 14 | 14. "We believe we shared a lot of the same moral values about helping people and treating all people fairly as Mrs. Jurriaans." |

258938.1

| Ex. | Affiant | Improper Conclusions/ Opinions | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | ¶ 16 | 16. "I, Joe, did not like Kimberly Good. She was always stuck on shotguns and shooting sports. She typically skirted around our areas of interest and seemed to focus on a certain group of people, predominately Caucasians, and did not cater to the needs of the Talladega community. She focused on shotguns, archery, and shooting. None of that helped the Talladega community. Wanda was about the community, but Kim wasn't. I believe the community was not in need of more activities on shooting guns. Wanda and Kim seemed to bump heads about the path of the 4-H program. Wanda wanted to take more of an entrepreneurial route." |
| | | ¶ 17 | 17. "Wanda wanted to do the Chick Chain Program…. Kim Good was against the program and said she did not want to do it." |
| | | ¶ 18 | 18. "Wanda was very personable…." |
| | | ¶ 19 | 19. "Throughout the years we've worked with Ms. Jurriaans, we always felt she valued us and the members of our community. We valued her too. She always came through for us." |
| | | ¶ 21 | 21. Ms. Jurriaans "had a very good working relationship with people." |
| | | ¶ 23 | 22. Ms. Jurriaans "showed us her passion for helping people." |
| D | Courtney Panneton & Laura Panneton | ¶ 3 | 3. "Mrs. Jurriaans created programs that would empower individuals and help them build their self-esteem." |
| | | ¶ 8 | 8. "Ms. Jurriaans has always gone above and beyond in her programming, helping individuals, and reaching out to the community." |
| | | ¶ 9 | 9. "There were several times in the Grassroots meetings that Mrs. Jurriaans offered good suggestions, however, her ideas were shot down by Kim Good." |
| | | ¶ 10 | 10. "[O]ther Agents … would only hand out |

| Ex. | Affiant | Improper Conclusions/ Opinions | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | brochures, which was not as effective." |
| | | ¶ 12 | 12. "Ms. Jurriaans was a good listener to the people in the community and provided programming based on what the community needed." |
| | | ¶ 13 | 13. "Kimberly Good was an agent that we describe as 'the Blonde Caucasian lady.' She acted as if she were in charge of the 4-H program. She also appeared to be a bigot. Many times, she and Wanda would have differences of opinion, and she would not listen to the ideas of Wanda, or the community, in the Grassroots meeting. Ms. Good wanted to focus on killing animals and shooting. When Wanda brought up good ideas in the meetings, her views were almost immediately shot down." |
| | | ¶ 14 | 14. "We observed that the ACES wanted to initiate a Chick-Chain program with the 4-H program, and that might have been one of the reasons Wanda was terminated. However, we observed that Kim never mentioned the Chick-Chain program in any of the Grassroot meetings." |
| | | ¶ 15 | 15. "Ms. Good was not a good person to teach kids. She didn't teach 4-H as we knew it to be, and we thought she was very rude and unprofessional." |
| | | ¶ 16 | 16. "The community appeared to believe that Ms. Good was over the 4-H program as she never talked about any of her other programs. Ms. Good's programs were what we considered to be 'off the wall.'" |
| | | ¶ 17 | 17. "I, Laura Panneton, once entered into a heated debate with Ms. Good after I made a comment about farmers getting subsidies while other businesses did not. Ms. Good took great offense to the comments and a heated debate ensued." |
| | | ¶ 18 | 18. "From our own observation, we could tell |

| Ex. | Affiant | Improper Conclusions/ Opinions | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | that multiple people, namely Henry and Sharon, were interested in getting Wanda's job." |
| | | ¶ 19 | 19. "Henry wanted the job...." |
| | | ¶ 20 | 20. "Sharon was looking to take Ms. Jurriaans' position.... She seemed and acted resentful towards Wanda. Based on our interaction with Sharon, we believed her to be a rude and unfriendly person." |
| | | ¶ 21 | 21. "When we called the office, Amanda was very unprofessional." |
| | | ¶ 23 | 23. "Wanda was a very proactive person...." |
| | | ¶ 24 | 24. "For the services and help Wanda provided to the community and individuals, she did not expect accolades." |
| | | ¶ 25 | 25. "The Community Action group took over the center room and scheduling became a problem...." |
| | | ¶ 27 | 27. "We were both disappointed in Auburn/ACES for terminating Mrs. Jurriaans...." |
| E | Cathy Sorrell[2] | p. 2 | "Ms. Jurriaans is a wonderful woman and enjoyable.... she loved her work." |
| | | p. 2 | "I believe that there were several individuals who had it out for Mrs. Jurriaans. I believe her secretary did her in and worked against Mrs. Jurriaans. The 4-H director did not like Mrs. Jurriaans, and Nancy Lehe attempted to discredit my experience with Mrs. Jurriaans and talked negatively about Mrs. Jurriaans." |
| G | Wanda Jurriaans | ¶ 2 | 2. "Age discrimination was most strongly brought by ACES to my attention at the CEC meeting at the 4-H center in August 2015." |
| | | ¶ 3 | 3. "I have reviewed ACES' Summary Judgment Brief, and now respond to the statements in it attributed to Dr. Lemme that |

---

[2] The "Written Statement of Cathy Sorrell" submitted as Exhibit E to Plaintiff's evidentiary submission (doc. 87-5) is not sworn and contains no verification of the accuracy of the contents therein, and should be stricken on that independent basis.

| Ex. | Affiant | Improper Conclusions/ Opinions | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | he was walking from table to table encouraging people to attend a retirement meeting. I adamantly dispute that."[3] |
| | | ¶ 4 | 4. "Mr. Stan Windham, my supervisor, made repeated comments related to my age by continuously referring to my years of experience." |
| | | ¶ 5 | 5. Characterizing comments by Mr. Windham as "comments about my age" |
| | | ¶ 6 | 6. "It would certainly have been [Mr. Windham's] job responsibility, first to identify such problems, and, secondly to help the employee make plans to improve the problem. If I had become involved with less seasoned, struggling employees, my job areas of responsibility could have suffered...." "Mr. Windham also stated, 'This has not happened, however, to an appropriate level that is becoming of her experience.' In my opinion, this is an age-related comment." |
| | | ¶ 7 | 7. "[Mr. Windham's] statement about 'mentoring and nurturing' reflects on my age. It made me feel like I was just an old employee who should spend all my time babying younger employees along." |
| | | ¶ 8 | 8. "I believe [Mr. Windham wanted] to create a paper trail to terminate me, because, at my age, I appear to Mr. Windham 'to be too old to effectively do the job.' To my knowledge, Mr. Windham was in Talladega County only |

---

[3] This statement should be stricken because it is clearly and inexplicably inconsistent with Jurriaans' deposition testimony on this point. *Compare Jurriaans 156:16-159:9* ("Q: So you don't know whether he asked other people to come to the meeting, too? A: No.); *see Van T. Junkins and Associates v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

258938.1

| Ex. | Affiant | Improper Conclusions/ Opinions | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | two times before his termination of my employment plan was initiated. He showed little to no interest in improving my performance, but only in building up a justification to fire me." |
| | | ¶ 9 | 9. "In all my years of employment at ACES, we were instructed that our signature on the evaluation was to state we had attended the evaluation, and that, if we did not agree with the evaluation, there was a performance evaluation appeal process." |
| | | ¶ 10 | 10. "I know how untrue [my evaluation] was, and that I was being set up.... I question wasting taxpayer's money for me to travel to Auburn from Talladega County, when the evaluation was completed and typed before I even arrived for the evaluation." |
| | | ¶ 15 | 15. "Behind my back without my first knowing it, plans were being made that involved the members on the CRD committee to bring in Henry to take my place." |
| | | ¶ 16 | 16. "It turned out to be a complete waste of time. Ms. Taylor said nothing helpful, and it became obvious that everything I said was used against me.... Ms. Taylor gave no helpful feedback.... This is consistent with the way I have heard ACES employees, since that time, describe Ms. Taylor, namely that she is anti-employee and pro-administration. I would not have gone to Ms. Taylor in the first place, had I known she would be so close-minded. That EEO office and Ms. Taylor are nothing more than a cover-up for Auburn University and ACES in their employment discrimination practices." |
| | | ¶ 17 | 17. "Unfortunately, there was a degree of rivalry among some people in Talladega County, who saw my job possibly coming open, due to my age. That could have contributed to some people speaking ill of me, |

258938.1

| Ex. | Affiant | Improper Conclusions/ Opinions | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | hoping to advance themselves. That is certainly the case of Amanda Gallagher, who rather than cooperate with me, and help me was undermining me, talking badly about me behind my back. However, there were many others who have spoken well of me, namely REA Clint East, Joseph and Laura Whitier, Ann Wilson, Courtney and Laura Pennington, Cathy Sorrell, Pete Baker, and I would go on. This reflects that I worked well with a broad spectrum of people. Others on the ACES payroll today may be afraid to stand up and speak the truth in my favor. They saw how easily I lost my job, and know how easy it would be for them to lose their job, too, I strongly dispute any allegations that I was not willing to work cooperatively with a broad spectrum of people." |
| | | ¶ 18 | 18. "I believe that from the form of her questions, Ms. McClendon was actually eliciting negative information about me to create a paper trail, or at least gave that impression to others, by indicating to others that I didn't know about the investigation. A follow-up conference would have shown good faith that we were trying to correct a situation, not to use it as a vehicle to get rid of me." |
| | | ¶ 19 | 19. "The other affidavits from people working with ACES named in paragraph 16 above greatly contradict the Defendant's suggestion." |
| | | ¶ 22 | 22. "I believe this reflects that ACES was only taking the negative comments about me and overlooked that I was willing to learn and make improvements on any personality flaws, and hone my skills accordingly." |

3.     The above specified paragraphs of the affidavits contain unsupported conclusions, based upon mere speculation and conjecture, and give opinions for which the affiants have no basis. The affidavits are therefore due to be stricken. *See Cyprian v. Auburn Univ. Montgomery*, 799 F. Supp. 2d 1262, 1273 (M.D. Ala. 2011) ("Affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper.") (citing *Thomas v. Ala. Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1112 (M.D. Ala. 2003))*; Turner v. City of Auburn*, 2008 U.S. Dist. Lexis 103165, at *35 (M.D. Ala. Dec. 19, 2008) (Fuller, J.) ("The requirements of Rule 56 make it plain that affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper.") (citing *Thomas*, 248 F. Supp. 2d at 1112; *Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1030 (M.D. Fla. 2000); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000)); *accord Hinson v. Chelsea Indus., Inc.*, 542 F. Supp. 2d 1236, 1242-43 (M.D. Ala. 2008) (striking portions of plaintiff's affidavit and noting:  "Paragraph 15 of Plaintiff's affidavit . . . is conclusory and states an impermissible legal conclusion which invades the province of the court.") (citing *HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp.2d 1232, 1239 (S.D. Ala. 2006) ("Another black-letter requirement of affidavits is that they must be rooted in facts, rather than conclusory remarks.")).

4.     The affidavits also contain inadmissible hearsay, including the following:

| Ex. | Affiant | Hearsay | Affidavit Testimony Excerpts |
|---|---|---|---|
| A | **Yvonne Bowens-Thomas** | ¶ 2 and Entire EEOC Charge and Affidavit (doc. 87-1, pp. 4-6) | Yvonne Bowens-Thomas's EEOC Charge and affidavit in support of that Charge, as well as references to the content thereof, constitute inadmissible hearsay in this case. |
| | | ¶ 6 | 6. "... I personally spoke with Regional Extension Agents, who serve Talladega County, and they always spoke very highlight of Ms. Jurrians, and especially how she procured funding for local Talladega County programs. I even remember at one meeting the Regional Extension agents talked about Ms. Jurrians obtaining funding to support family and consumer science programs, but that she was not supported by ACES...." |
| | | ¶ 9 | 9. "The reason I didn't go to Kelly Taylor of Auburn's EEO office is that she and her office always had the reputation of only supporting Auburn University. In fact, among ACES employees who had dealings with Ms. Taylor and her office, Ms. Taylor and her assistants were always known for siding with Auburn University and for getting ACES employees to divulge information they could use against ACES employees in defending Auburn and ACES." |
| C | **Joseph Whitfield & Laura Harris Whitfield** | ¶ 4 | 4. "Ms. Kimberly Good said becoming a 4-H volunteer required a lot of paperwork and denied the activities we were interested in. Ms. Good even refused the Chick-Chain idea." |
| | | ¶ 10 | 10. "Ms. Jurriaans ... told us we needed more space and she would help us." |
| | | ¶ 13 | 13. "Ms. Jurriaans ... encouraged high school students to join 4-H and to pursue entrepreneurial ideas.... She encouraged them to harvest their crops...." |
| | | ¶ 17 | 17. "Wanda wanted to do the Chick Chain Program . . . . Kim Good was against the program and said she did not want to do it." |

258938.1

| Ex. | Affiant | Hearsay | Affidavit Testimony Excerpts |
|------|---------|---------|------------------------------|
| D | **Courtney Panneton & Laura Panneton** | ¶ 6 | 6. "One day a car crashed into Ms. Josie's home, and Mrs. Wanda made phone calls to people into the community and through those people was able to gather supplies and help repair Ms. Josie's home." |
| | | ¶ 11 | 11. "Many times, we heard Mrs. Jurriaans offer to help other agents, but her assistance was declined." |
| | | ¶ 16 | 16. "The community appeared to believe that Ms. Good was over the 4-H program as she never talked about any of her other programs." |
| E | **Cathy Sorrell** | p. 2 | "... Nancy Lehe attempted to discredit my experience with Mrs. Jurriaans and talked negatively about Mrs. Jurriaans." |
| | | p. 2 | "At one time before she was let go, the people on the other side of the building insisted that she clean out those offices so they could move some of their people over there.... the last I heard they never moved over there." |
| G | **Wanda Jurriaans** | ¶ 9 | 9. "In all my years of employment at ACES, we were instructed that our signature on the evaluation was to state we had attended the evaluation, and that, if we did not agree with the evaluation, there was a performance evaluation appeal process." |
| | | ¶ 11 | 11. "I contacted REAs Debra Ward and Isaac Chappell to ask if they would agree to be included in the grant proposal since programs included in the proposal would be in their subject matter area. Both stated that they would like to work with me on the project." |
| | | ¶ 12 | 12. "I remember how Eddy May, an employee with USDA Community and Rural Development, and his supervisor from Opelika and a faculty member from the Community College located in Talladega came to my office to discuss a grant application with CRD. At the beginning of the discussion I understood that the Community College faculty member was applying for the grant, and was wanting agricultural information. Eddy May stated they wanted me to apply for the |

| Ex. | Affiant | Hearsay | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | grant." |
| | | ¶ 13 | 13. "I … immediately telephoned Eddy May, and asked what was going on. Mr. May rudely said, 'You haven't started that project have you'? I stated no, I need to complete the budget. Mr. May then replied, 'We just need to put that project on hold'. I responded, 'You all asked me to do the project and I have put a lot of time and effort in making contacts for the project and writing the proposal'. Mr. May then stated, 'I will get back with you.'" |
| | | ¶ 16 | 16. "This is consistent with the way I have heard ACES employees, since that time, describe Ms. Taylor, namely that she is anti-employee and pro-administration." |
| | | ¶ 19 | 19. "The other affidavits from people working with ACES named in paragraph 16 above greatly contradict the Defendant's suggestion…. I very much helped the family of Joseph and Laura Whitfield and their son in the Chic Chain project, and they have stated that in their affidavit supporting me." |

5.     The above-referenced hearsay portions are due to be stricken. *See Burgest v. United States*, 316 Fed. Appx. 955, 956 (11th Cir. 2009) ("Inadmissible hearsay [in an affidavit] cannot be considered when deciding a motion for summary judgment."); *Keith v. MGA, Inc.*, 2006 U.S. Dist. Lexis 20879, at *14 n. 4 (M.D. Ala. Apr. 14, 2006) ("Because affidavits submitted in opposition to a motion for summary judgment must present facts that would be admissible in evidence, *see* Fed. R. Civ. P. 56(e), MGA's motion is granted to the extent that it seeks to strike the portions of Griffin's affidavit that constitute inadmissible hearsay.").

6. Further, the affidavits do not comply with Rule 56(e) of the Federal Rules of Civil Procedure, which requires that affidavits "must be made on personal knowledge, set out such facts as would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *See, e.g. Shaw v. Coosa County Comm'n*, 434 F. Supp. 2d 1196, 1198 (M.D. Ala. 2005) (Fuller, J.) ("It is important to note that Reynolds has not been identified or qualified as an expert witness in this case; rather she is merely a fact witness. As such her *personal knowledge* should have been limited to information she obtained through the exercise of her own senses. Moreover, her affidavit should be clearly worded to indicate the specific circumstances in which she obtained the personal knowledge about certain facts. Simply generally stating at the beginning of her affidavit that she worked at the Coosa County Jail is not alone sufficient to apprise the Court as to whether she actually has any personal knowledge regarding the matters contained in her affidavit."); *Kerns v. Sealy*, 2007 U.S. Dist. Lexis 48918, No. 06-0431, at *5-6 (S.D. Ala. July 6, 2007) (striking portion of affidavit the court found to "flunk the personal knowledge requirement").

7. Significantly, the affidavits and certified statements Jurriaans has submitted do not state that the matters set out therein are based on personal knowledge. The certified statements provide that the information provided therein are "accurate to best of my knowledge"—this is not sufficient to satisfy Rule 56(e). *See, e.g., McLeod v. Field Asset Servs., LLC*, No. CV 15-00645-KD-M, 2017 WL 338002, at *3 (S.D. Ala. Jan. 23, 2017) (collecting cases) ("A

14

certification "to the best of my knowledge"—without any articulation of how [the affiant] has personal knowledge—is insufficient.").

8.     A close review of the statements made in the affidavits makes clear that many are not based upon personal knowledge.  For example, the following paragraphs are not based on personal knowledge and are due to be stricken:

| Ex. | Affiant | Lack of Personal Knowledge | Affidavit Testimony Excerpts |
|---|---|---|---|
| A | Yvonne Bowens-Thomas | ¶ 2 | 2. "[R]ather than try to help me himself, Mr. Windham, in an email, simply directed me to contact the EEOC 'if I felt like I was being harassed, bullied, or retaliated against.'" |
| | | ¶ 3 | 3. "Mr. Windham's reaction to me was typical. He was already very distant, not "hands-on," and always very insensitive and unhelpful to me as a County Coordinator. That pattern of behavior continued even after I was reassigned to an Agent II position with Montgomery County." |
| | | ¶ 4 | 4. "[Ms. Jurriaans] was a real 'people person....'" |
| | | ¶ 6 | 6. "... I personally spoke with Regional Extension Agents, who serve Talladega County, and they always spoke very highlight of Ms. Jurrians, and especially how she procured funding for local Talladega County programs. I even remember at one meeting the Regional Extension agents talked about Ms. Jurrians obtaining funding to support family and consumer science programs, but that she was not supported by ACES...." |
| | | ¶ 7 | 7. "... Mr. Windham did not like independent thinkers like Ms. Jurriaans, me, and others. He always insisted on his own opinion, even when he lacked evidence or research-based information to support his position." |
| | | ¶ 8 | 8. "My conclusion is that Stan Windham lacked the experience, knowledge, skills, and ability to effectively supervise county extension |

| Ex. | Affiant | Lack of Personal Knowledge | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | coordinators. Mr. Windham's deficiency was especially noticed when compared to previous district extension coordinators in Mr. Windham's job...." |
| | | ¶ 9 | 9. "The reason I didn't go to Kelly Taylor of Auburn's EEO office is that she and her office always had the reputation of only supporting Auburn University. In fact, among ACES employees who had dealings with Ms. Taylor and her office, Ms. Taylor and her assistants were always known for siding with Auburn University and for getting ACES employees to divulge information they could use against ACES employees in defending Auburn and ACES." |
| B | Ann Wilson | p. 3 | "[Ms. Jurriaans] strives to treat everyone the same. She has been nothing but helpful to people especially those that participate in the ACES." |
| | | p. 3 | "Since Ms. Jurriaans' termination, there has been no more activities nor communication from the ACES" |
| C | Joseph Whitfield & Laura Harris Whitfield | ¶ 4 | 4. "Ms. Kimberly Good . . . denied the activities we were interested in. Ms. Good even refused the Chick-Chain idea." |
| | | ¶ 5 | 5. Ms. Jurriaans "focused on entrepreneurship with the help of Isaac (an extension employee). She and Isaac held workshops and provided resource materials about entrepreneurship for the 4-H club. Wanda taught the 4-H members how to make money using their skills and talents through a monthly meeting." |
| | | ¶ 7 | 7. "Ms. Jurriaans wanted to start a Chick-Chain program...." |
| | | ¶ 12 | 12. Ms. Jurriaans "has been integral in helping the Agricultural (animal and plant systems) program to gain its Business Industry Certification...." |
| | | ¶ 14 | 14. "We believe we shared a lot of the same moral values about helping people and treating |

| Ex. | Affiant | Lack of Personal Knowledge | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | all people fairly as Mrs. Jurriaans." |
| | | ¶ 16 | 16. "[Kimberly Good] was always stuck on shotguns and shooting sports. She typically skirted around our areas of interest and seemed to focus on a certain group of people, predominately Caucasians, and did not cater to the needs of the Talladega community. She focused on shotguns, archery, and shooting. None of that helped the Talladega community. Wanda was about the community, but Kim wasn't.... Wanda and Kim seemed to bump heads about the path of the 4-H program. Wanda wanted to take more of an entrepreneurial route." |
| | | ¶ 17 | 17. "Wanda wanted to do the Chick Chain Program.... Kim Good was against the program and said she did not want to do it." |
| | | ¶ 19 | 19. "Throughout the years we've worked with Ms. Jurriaans, we always felt she valued us and the members of our community." |
| | | ¶ 20 | 20. "Because of Wanda's work in the community, the Kelly Springs Baptist Church even started a garden." |
| | | ¶ 21 | 21. Ms. Jurriaans "had a very good working relationship with people." |
| D | Courtney Panneton & Laura Panneton | ¶ 5 | 5. "When two male agents ... did not show up to the BBQ portion of a competition, Mrs. Jurriaans gladly stepped in...." |
| | | ¶ 6 | 6. "One day a car crashed into Ms. Josie's home, and Mrs. Wanda made phone calls to people into the community and through those people was able to gather supplies and help repair Ms. Josie's home." |
| | | ¶ 8 | 8. "Ms. Jurriaans has always gone above and beyond in her programming, helping individuals, and reaching out to the community." |
| | | ¶ 12 | 12. "Ms. Jurriaans was a good listener to the people in the community and provided programming based on what the community |

| Ex. | Affiant | Lack of Personal Knowledge | Affidavit Testimony Excerpts |
|---|---|---|---|
| | | | needed." |
| | | ¶ 13 | 13. "Kimberly Good was an agent that we describe as 'the Blonde Caucasian lady.' She acted as if she were in charge of the 4-H program. She also appeared to be a bigot. Many times, she and Wanda would have differences of opinion, and she would not listen to the ideas of Wanda, or the community, in the Grassroots meeting. Ms. Good wanted to focus on killing animals and shooting. When Wanda brought up good ideas in the meetings, her views were almost immediately shot down." |
| | | ¶ 14 | 14. "We observed that the ACES wanted to initiate a Chick-Chain program with the 4-H program, and that might have been one of the reasons Wanda was terminated. However, we observed that Kim never mentioned the Chick-Chain program in any of the Grassroot meetings." |
| | | ¶ 15 | 15. "Ms. Good was not a good person to teach kids. She didn't teach 4-H as we knew it to be...." |
| | | ¶ 16 | 16. "The community appeared to believe that Ms. Good was over the 4-H program as she never talked about any of her other programs. Ms. Good's programs were what we considered to be 'off the wall.' In one instance, Ms. Good showed bones and dead animals to the children." |
| | | ¶ 17 | 17. "I, Laura Panneton, once entered into a heated debate with Ms. Good after I made a comment about farmers getting subsidies while other businesses did not. Ms. Good took great offense to the comments...." |
| | | ¶ 18 | 18. "From our own observation, we could tell that multiple people, namely Henry and Sharon, were interested in getting Wanda's job." |
| | | ¶ 19 | 19. "Henry wanted the job; however, ... he didn't show up to the grassroots meetings and missed other meetings with the Cattlemen, in which |

| Ex. | Affiant | Lack of Personal Knowledge | Affidavit Testimony Excerpts |
|-----|---------|---------------------------|------------------------------|
| | | | Wanda would go in his place." |
| | | ¶ 20 | 20. "Sharon was looking to take Ms. Jurriaans' position.... She seemed and acted resentful towards Wanda." |
| | | ¶ 22 | 22. "We were very familiar with Verhonda, Wanda's previous secretary. When Verhonda's mother and husband passed, Wanda was there to support her in both cases. In an incident where Verhonda did not deposit money from the sales of a cookbook, Verhonda could have been fired. However, Wanda protected her and covered for her so that Verhonda would not lose her job." |
| | | ¶ 23 | 23. "Wanda was a very proactive person...." |
| | | ¶ 24 | 24. "For the services and help Wanda provided to the community and individuals, she did not expect accolades." |
| | | ¶ 25 | 25. "The Community Action group took over the center room and scheduling became a problem. When there was no one at the front for Community Action, Wanda would assist people who came in looking for Community Action services." |
| E | Cathy Sorrell | p. 2 | "Ms. Jurriaans .... loved her work." |
| | | p. 2 | "I believe that there were several individuals who had it out for Mrs. Jurriaans. I believe her secretary did her in and worked against Mrs. Jurriaans. The 4-H director did not like Mrs. Jurriaans, and Nancy Lehe attempted to discredit my experience with Mrs. Jurriaans and talked negatively about Mrs. Jurriaans." |
| G | Wanda Jurriaans | ¶ 8 | 8. "I believe [Mr. Windham wanted] to create a paper trail to terminate me, because, at my age, I appear to Mr. Windham 'to be too old to effectively do the job.' To my knowledge, Mr. Windham was in Talladega County only two times before his termination of my employment plan was initiated. He showed little to no interest in improving my performance, but only in building up a justification to fire me." |

| Ex. | Affiant | Lack of Personal Knowledge | Affidavit Testimony Excerpts |
|-----|---------|---------------------------|------------------------------|
|     |         | ¶ 15                      | 15. "Behind my back without my first knowing it, plans were being made that involved the members on the CRD committee to bring in Henry to take my place." |

### The Exhibits and Affidavits are Irrelevant and Are Not Proper "Pattern and Practice" Evidence

9.  Plaintiff's exhibits A (Affidavit of Yvonne Bowens-Thomas; EEOC Charge of Yvonne Bowens-Thomas), H (EEOC Charge and Affidavit of Margaret Odom), J (EEOC Charge and Affidavit of Melanie Allen), K (EEOC Charge and Affidavit of Wanda Carpenter), and L (EEOC Charge and Affidavit of Sallie Hooker) constitute improper hearsay in this case, and should be stricken on that basis. Moreover, these exhibits also should be stricken as irrelevant and because they are not proper "pattern and practice" evidence.

10.  As an initial matter, each of these affiants are simply other clients of Jurriaans' lawyer. *See doc. 76 at 3* (regarding Jurriaans' lawyer's representation of Odom, Allen, Carpenter, and Hooker); *see generally Yvonne Bowens-Thomas v. Alabama Cooperative Extension System, et al.*, Case No. 2:16-cv-00621-MHT-WC (M.D. Ala.). Jurriaans cannot survive summary judgment merely by heaping together the irrelevant allegations of others who happen to share the same lawyer.

11.  More important, the exhibits are not proper pattern and practice evidence (a claim Jurriaans cannot make anyway, *see doc. no. 76*), which is

typically presented in the form of statistical evidence, as opposed to the testimony and EEOC charges of former employees presented here. *See EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273-74 (11th Cir. 2000) (explaining that a plaintiff may establish a pattern or practice claim by presenting strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class differently).

12.     These exhibits have no bearing on Jurriaans' discrimination or retaliation claims and are irrelevant. Because they are not proper pattern and practice evidence and are irrelevant to Jurriaans' claims, the exhibits are due to be stricken in their entirety.

## <u>CONCLUSION</u>

For the reasons shown above, the Court should:

(i)     strike the above-referenced affidavits in their entirety because they contain improper conclusions and opinions which the affiants are not qualified to state, hearsay and assertions made without personal knowledge; or, at a minimum, strike the offending portions of the affidavits as set forth above (and highlighted in attached Exhibits 1-6 hereto) and strike all corresponding references in Jurians' brief in opposition to summary judgment (*doc. no. 86*) to these exhibits or portions thereof;

(ii)    and (ii) strike the irrelevant "pattern and practice" evidence, along with all corresponding references in Jurriaans' brief in opposition to summary judgment (*doc. no. 86*) to such documents.

Respectfully submitted this the 28th day of December, 2018.

258938.1

*s/ Dorman Walker*
One of counsel for defendants


OF COUNSEL:
David R. Boyd (ASB-0727-D52D)
dboyd@balch.com
Dorman Walker (ASB-9154-R81J)
dwalker@balch.com
John Naramore (ASB-6120-S01H)
jnaramore@balch.com
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL 36101
334/834-6500


## CERTIFICATE OF SERVICE

I certify that on December 28, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and service will be perfected upon the following by email and/or US mail:

Julian McPhillips
McPhillips Shinbaum, LLP
516 South Perry Street
Montgomery, AL 36104

Tanika LaRosa Lakes Finney
tanika@tlfinneylaw.com
Law Offices of Tanika L. Finney
516 South Perry Street
Montgomery, AL 36104

*s/Dorman Walker*
Of Counsel

258938.1