IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| WANDA JURRIAANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:17-CV-124-WKW |
| | ) | [WO] |
| ALABAMA COOPERATIVE | ) | |
| EXTENSION SYSTEM; | ) | |
| AUBURN UNIVERSITY; GARY | ) | |
| LEMME, STANLEY WINDHAM, | ) | |
| CHRIS McCLENDON, KYLE | ) | |
| KOSTELECKY, and PAUL | ) | |
| BROWN, in their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Wanda Jurriaans worked for the Alabama Cooperative Extension System (ACES) for fifty-one years.  But after a complaint from a local government official, ACES investigated Jurriaans and concluded that she had "seriously strained" relationships with government officials and her colleagues.  This came on the heels of a performance evaluation that criticized her for "inconsistent" performance and leadership.  ACES fired Jurriaans and replaced her with a man in his fifties.  Jurriaans claims she is a victim of age discrimination and retaliation.  But no reasonable jury could find that the reasons for firing her are pretextual, so Defendants' motion for summary judgment (Doc. # 77) is due to be granted.

# I. JURISDICTION AND VENUE

The court has subject-matter jurisdiction under 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

# II. STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the parts of the record that show there is no genuine dispute of material fact. A movant who does not bear a trial burden of production may also assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B). If the moving party meets its burden, the burden shifts to the nonmoving party to present evidence of a genuine dispute of material fact. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact-finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. FACTS

Wanda Jurriaans was born in 1942. She worked for ACES from 1965 until she was fired in 2016. Defendants say that Jurriaans lost her job because she strained relationships with government officials, did not get along with her colleagues, and did not consistently meet expectations. Are those the real reasons, or are they pretext for discrimination and retaliation? Answering those questions require understanding how ACES works and what happened during Jurriaans's last year-and-a-half with ACES.

## A.     The Alabama Cooperative Extension System

ACES is a partnership between Alabama A&M University and Auburn University. It exists to deliver "research-based educational programs that enable people to improve their quality of life and economic well-being." (Doc. # 79-3, at 47–48.) In other words, ACES diffuses into the community what researchers learn at Auburn and Alabama A&M. It works in urban and rural areas, providing "useful and practical information on subjects relating to agriculture, forestry and natural resources, family and individual well-being, youth development, community and economic development, and other areas." Act of Aug. 2, 2005, No. 304, § 1, 2005 Ala. Laws 607, 609 (codified at Ala. Code § 2-30-2).

Auburn and Alabama A&M jointly administer ACES. Auburn appoints an Extension Director, while Alabama A&M appoints an Extension Administrator. The

Extension Director and Extension Administrator cooperate to ensure ACES's statewide success, but they separately monitor the work done at their respective schools. Each has an Associate Director as his or her second-in-command. (Doc. # 79-3, at 55, 58.) Defendant Gary Lemme has been the Extension Director since 2011. Defendant Paul Brown has been the Associate Director at Auburn since 2009. (Doc. # 79-6, at 4; Doc. # 79-5, at 4.)

Lemme and Brown supervise a team of Assistant Directors.[1] Most Assistant Directors are responsible for programs in certain content areas. For example, there is an Assistant Director for 4-H programs, another for agriculture and forestry programs, and another for family and consumer sciences programs. These program-focused Assistant Directors oversee Regional Extension Agents (REAs). REAs work in designated geographical regions in Alabama, and they work on programs in their content area. (Doc. # 79-3, at 60, 66.) Defendant Kyle Kostelecky was the Assistant Director for Family and Consumer Sciences in 2015 and 2016, though he no longer works for ACES. His office was at Auburn University. (Doc. # 79-8, at 12, 20.)

ACES keeps an office in each of Alabama's sixty-seven counties because it is "committed to maintaining a strong local presence" in each county. (Doc. # 79-3, at

---

[1] Lemme also supervises Defendant Chris McClendon, the Director of Human Resources for the ACES activities based at Auburn University. (Doc. # 79-3, at 59, 79; Doc. # 79-7, at 4.)

51.)  Each office is led by a County Extension Coordinator (CEC), who serves as the "principal community liaison."  (Doc. # 79-3, at 51.)  CECs are thus responsible for arranging and coordinating programs in their counties, building and strengthening relationships with stakeholders, and leading their offices.  (Doc. # 79-3, at 51, 67.)  CECs must know the needs in their counties and implement programs accordingly.  They are the "primary contact" for local government officials, and securing funding from local government is a key part of their job (as is applying for grants from other sources).  (Doc. # 79-3, at 51, 104.)  CECs work with REAs, but neither works for the other.  CECs report to the Assistant Director for County Office Operations — a post held by Defendant Stanley Windham at all times relevant to this lawsuit.  (Doc. # 79-3, at 6, 61, 104.)  Windham's office is at Auburn University, though the sixty-seven CECs he supervises are scattered across the state.  (Doc. # 79-5, at 17, 31.)

**B.    Wanda Jurriaans's Employment**

Jurriaans joined ACES after she graduated from college.  From 1965 to 1990, she worked on home economics, nutrition, and 4-H projects.  Then in 1990, she became the County Extension Coordinator for Talladega County.  (Doc. # 79-4, at 35–38.)  At first, Jurriaans was successful as a CEC.  But this case is about her more recent performance.

**1.    *Jurriaans's 2014 performance evaluation criticized her leadership and communication skills.***

Every year, Windham gives a written performance evaluation to each CEC.

5

In February 2015, Windham gave Jurriaans her review for the 2014 calendar year. He rated her overall performance as a 3 out of 5, meaning her work was "satisfactory and effective in meeting expected levels of performance."[2] (Doc. # 79-1, at 15.) He included positive comments, opining that she was "quite innovative," was "diligent to seek input," would "foster programming," was "very responsive to clientele needs and requests," and had "a good view and understanding of what would make Talladega County a better place to work and live." (Doc. # 79-1, at 14–15.) He noticed that Jurriaans was a disciplined and detail-focused employee who used her experience to build programs. (Doc. # 79-1, at 7–8.) And Windham said she was "very willing to be a team player and support team projects." (Doc. # 79-1, at 12.)

But Jurriaans's 2014 evaluation was not all roses. Six weeks before he gave Jurriaans her evaluation, Windham learned that an ACES employee had gone to the Clay County CEC "on numerous occasions in tears or nearly in tears, exasperated about the working environment in Talladega County." (Doc. # 79-1, at 17; *see* Doc. # 87-6, at 6.) And in the evaluation, Windham criticized Jurriaans's leadership and communication style. He told her to soften her tone and to be more supportive of less-experienced employees:

---

[2] Evaluations use this five-level rating scale: (5) "Consistently exhibits a high degree of expertise and productivity"; (4) "Regularly exceeds job requirements and expectations"; (3) "Satisfactory and effective in meeting expected levels of performance"; (2) "Is inconsistent in meeting expected levels of performance"; and (1) "Below acceptable levels of performance." (Doc. # 79-1, at 6, 15; Doc. # 79-4, at 67–68.)

- "Wanda has a wealth of experience and as the front line supervisor for the Talladega County Office — has an opportunity to mentor agents and others to a high level. One item that would help this cause is to be mindful of approach to people — stay positive as much as possible — as she works with all employees." (Doc. # 79-1, at 7.)

- "Wanda is very willing to be a team player and support team projects. This area would be enhanced by reaching out to internal and external entities and making this better known to those serving and supporting her office." (Doc. # 79-1, at 12.)

- "She . . . could soften her verbal and managerial approach particularly with . . . ACES employees. She could attain the same results by utilizing her vast experience and ideas and reaching out to employees with a more supportive approach. In her mind she is meeting needs and she does many times — however approach is everything as we build relationships with those we supervise and work with." (Doc. # 79-1, at 13.)

- "[Effective communication] would be enhanced by being careful to control especially verbal approach to mainly ACES employees. Her intent is good — verbal delivery could be more productive." (Doc. # 79-1, at 14.)

In general, Windham suggested that Jurriaans work on "utilizing her experience to a higher level" and "communicating with and mentoring younger agents in a more nurturing fashion." (Doc. # 79-1, at 15.)

While he gave them less attention, Windham noted two other areas of concern in Jurriaans's 2014 evaluation. One was that funding from Talladega County "could possibly increase." (Doc. # 79-1, at 10.) The other concern was "collegiality issues" in the local 4-H program. (Doc. # 79-1, at 11.) Windham did not pin all the blame on Jurriaans, and he recognized that Jurriaans "worked to resolve" the collegiality

issues, but he still mentioned them.  (Doc. # 79-1, at 11.)

### 2.   *Jurriaans was invited to a meeting about planning for retirement.*

Now fast-forward six months.  In August 2015, CECs from across the state met for a two-day professional development workshop.  One of the programs at the workshop was an after-dinner meeting about planning for retirement.  Attendance was optional; CECs could go home early rather than sit through the meeting.  But Gary Lemme, the Extension Director, wanted people to attend.  He testified that he "made a general announcement" to "everybody" and went to "every table" inviting CECs.  (Doc. # 79-6, at 7.)  And Lemme states that "a wide spectrum of ages of experienced people" stayed for the meeting.  (Doc. # 79-6, at 8.)

Jurriaans says that Lemme invited her four times and was "adamant" that she attend.  After Lemme's second invitation, she told him, "I may want to work until I die."  (Doc. # 79-4, at 41; Doc. # 87-11, at 3.)  Jurriaans also asserts that Lemme made no announcement at her table, but she admits that she does not know who all Lemme invited.  (Doc. # 79-4, at 41; Doc. # 87-6, at 2.)  Jurriaans also thought that Lemme was encouraging her to retire, but she does not identify a direct statement to that effect.[3]  Both Lemme and Jurriaans went to the meeting.  (Doc. # 79-4, at 41.)

---

[3] The record does not support an inference that Lemme directly told Jurriaans that she should retire.  Her story has consistently been that talk about planning for retirement sent a message that she should retire.  She does say that in the summer of 2016, she told Auburn that Lemme had "encouraged [her] to retire" (Doc. # 79-4, at 41), but that is evidence of a complaint, not Lemme's words.  Jurriaans also says that Lemme was "encouraging [her] about retirement" (Doc. # 87-6, at 2), but that does not reasonably support an inference of direct encouragement to retire.

**3.    *Jurriaans's 2015 evaluation criticized her for inconsistent leadership, communication, county engagement, and 4-H programs.***

Now fast-forward again, this time to January 2016.  That is when Windham gave Jurriaans her 2015 performance evaluation.  He rated her overall performance as a 2 out of 5, meaning that she was "inconsistent in meeting established standards of performance."  (Doc. # 79-4, at 67.)  Windham gave Jurriaans high marks for civil rights compliance, securing grant funding, grassroots organization, and more.  But, as in 2014, Windham criticized Jurriaans's leadership and communication skills, as well as what he said was a failure to promote "new and innovative" programs.  In making his critiques, Windham referenced Jurriaans's "experience."  For example:

- "One area that needs improvement is Office Culture.  Given her experience and abilities to foster positive and highly functioning programs, the overall feeling and attitude of the local office is below basic standards."  (Doc. # 79-4, at 69.)

- "There is a feeling by many serving this office that they must struggle to get things done in this County because of Wanda.  She needs to be proactive to change this perception."  (Doc. # 79-4, at 69.)

- "Given her abilities, experience, and knowledge — she could mentor, lead, and foster most any program and effort that is appropriate to ACES' mission.  Further, she could be an excellent asset to less seasoned employees and those struggling with various areas of their job.  This has not happened however to an appropriate level that is becoming of her experience and abilities."  (Doc. # 79-4, at 68.)

- "It appears she many times is difficult to deal with on projects she does not embrace, lacks an embracing nature related to innovation in some projects, and thus is not as impactful in her County to the

level you would expect for someone with her skills and knowledge."
(Doc. # 79-4, at 68.)

- "She and I on many occasions have discussed her need to utilize [her talent and experience] to help and mentor less experienced colleagues. This has not occurred to the level that it could. . . . A few suggestions would involve a positive approach and willing hand when approached related to programming. In addition, praise and constructive guidance would go a long way towards helping less seasoned professionals feel more confident and willing to be housed and work in her County." (Doc. # 79-4, at 71.)

- "Given her [position and experience], she is not as catalytic in fostering or embracing new and innovative programming, as much as she could be given her level of experience." (Doc. # 79-4, at 72.)

- "Basic improvement could be attained thru an open and proactive willingness to work with all ACES personnel in a mentoring and nurturing fashion, sustain traditional and proven programming while being willing to try new/innovative programming efforts, and be mindful that proving impact to County citizens and stakeholders will enhance her image, success, and consequently the success and image of ACES in Talladega County." (Doc. # 79-4, at 68.)

Windham also critiqued Jurriaans's relationship with Talladega County. He noted that though the county seemed financially sound, it had not increased funding to ACES in years. He also pointed out that ACES used less office space in the county building than it had in the past. He said these failures to expand reflected "some level of disconnect" between ACES and the county. (Doc. # 79-4, at 70.)[4]

Finally, Windham expressed concern about 4-H programs. 4-H membership

---

[4] Windham later stated that the apparent "failure to build a positive relationship between ACES and Talladega County leadership" was "alarming" and "worrisome" because it jeopardized future funding from the county. (Doc. # 79-1, at 3.)

had declined, and Windham noted apparent "issues" between Jurriaans and the local 4-H REA, Kim Good. (Doc. # 79-4, at 77.) Windham opined that Jurriaans did not fully embrace "innovative and new programming approaches." (Doc. # 79-4, at 77.)[5]

Jurriaans tried to appeal this evaluation. (Doc. # 79-3, at 155–56.) According to ACES administrators, there is no formal appeals process for annual evaluations. (Doc. # 79-3, at 15, 147; Doc. # 79-5, at 29; Doc. # 79-6, at 12). Still, Windham let Jurriaans attach comments to the evaluation. (Doc. # 79-3, at 147–50.) Windham also told Jurriaans that he would help her improve. (Doc. # 79-1, at 3; Doc. # 79-3, at 147.)

In March 2016, Jurriaans met with Associate Director Paul Brown to discuss her objections to her 2015 evaluation. Jurriaans gave Brown a written rebuttal to the evaluation (*see* Doc. # 79-3, at 149–50), and Brown agreed to attach that rebuttal to the evaluation (Doc. # 79-5, at 14–15). But Brown concurred with Windham's assessment, asserting that Jurriaans's performance was subpar given her experience as a CEC. In his deposition, Brown opined that Jurriaans did not go beyond the basics in some projects. He stated that there was a history of people not wanting to work with Jurriaans. (Doc. # 79-5, at 16–17.) Finally, he said that her approach to 4-H programs was "elementary" and that she did not work well with the local 4-H

---

[5] Jurriaans seems to admit that 4-H enrollment fell during her tenure as CEC. (Doc. # 79-4, at 33.) According to Paul Brown, enrollment increased after Jurriaans left. (Doc. # 79-5, at 34.)

REA, Kim Good.  (Doc. # 79-5, at 23, 25–26, 34.)

### 4. *Chris McClendon concluded that Jurriaans had "seriously strained" relationships with county officials and ACES employees.*

Even after Jurriaans's meeting with Brown, Windham says that he considered

how to help Jurriaans improve.  (Doc. # 79-1, at 3.)  But Windham got an email from

Pat Lyle, the Talladega County Administrator, on April 15, 2016.  Lyle wrote:

> The County owns and maintains the building that houses the Extension
> Service and other agencies.  Since I came to the County in January
> 2015, I've had to spend more time than I should mediating between
> Extension Coordinator, Ms. Wanda Jurriaans, other occupants of the
> building, and the County maintenance staff.  If you are the person that
> I need to speak with, please give me a call at your convenience.  My
> direct line is 256-299-XXXX.

(Doc. # 79-1, at 22.)  This was big news according to Windham, Brown, and Lemme.

(*See* Doc. # 79-1, at 4; Doc. # 79-5, at 30; Doc. # 79-6, at 10, 13.)  ACES relies on

cooperation with — and funding from — Talladega County, and it appeared that

Jurriaans threatened that relationship.  So Chris McClendon, the Director of Human

Resources, went to investigate the situation.  (Doc. # 79-1, at 4.)

McClendon interviewed ten ACES employees and three Talladega County

officials.  McClendon did not tell Jurriaans about the interviews, and McClendon

told the interviewees that she would keep their answers "discreet to the extent

possible."  (Doc. # 79-3, at 119; *see* Doc. # 79-7, at 14, 18–19.)  McClendon also

told the interviewees that she had been "requested by Wanda's supervisor and ACES

Administration  to  conduct  an  investigation  regarding  the  leadership  and

12

management style of the CEC in Talladega County."  McClendon asked about their "experiences in working with Ms. Jurriaans."  (Doc. # 79-3, at 119.)

McClendon finished her investigation in May 2016, and her report paints a dismal picture of the Talladega County office.  (*See* Doc. # 79-3, at 118, 143.)  First, McClendon wrote that relationships with Talladega County leaders were "seriously strained."  (Doc. # 79-3, at 120.)  According to the report, all three county officials heard Jurriaans refer to African-Americans as "those people," one heard her say that there were "way too many blacks in here," and two were concerned about how infrequently citizens visited the ACES office.  Two officials allegedly said that Jurriaans would not let people use an auditorium in a county-owned building, prompting the county to take scheduling control away from Jurriaans.  And per the report, county officials said Jurriaans was "a source of frustration," "very difficult to work with," "unpleasant," and "not good to represent ACES."  (Doc. # 79-3, at 120–21.)

Second, McClendon reported that Jurriaans's colleagues did not like working with her.  McClendon wrote that an REA who worked on 4-H projects said Jurriaans was "unable to foster collegial and productive working relationships" and made things "difficult."  Most REAs avoided Jurriaans, McClendon reported.  No REA used the Talladega County office as his or her home base; only Jurriaans and her assistant, Amanda Gallagher, worked in the office.  (Doc. # 79-4, at 13.)  Gallagher

reportedly described the office culture as "hostile," said that she felt "very limited in her ability to function," and suggested that Jurriaans was "mean and a bully." Other employees described Jurriaans as "dictatorial" and "not a good people person." (Doc. # 79-3, at 119, 122.)

To be sure, some employees had adapted to Jurriaans (Doc. # 79-3, at 119), and everyone interviewed found something positive to say about her (Doc. # 79-7, at 20–24). But according to McClendon, there was "an overall lack of leadership in the Talladega County Extension Office primarily due to [Jurriaans's] inability to foster a creative and collegial office environment." Jurriaans's "communication and management style hinders production, output and/or [Auburn] University operations as well as adversely affecting morale," McClendon continued. (Doc. # 79-3, at 122.)

### 5.   *ACES suspended Jurriaans and ultimately fired her.*

On May 26, 2016, Windham and McClendon shared the investigation results with Jurriaans. (Doc. # 79-1, at 4; Doc. # 79-7, at 25.) Windham says Jurriaans "refused to accept any constructive criticism" at that meeting, but Jurriaans disputes that. (Doc. # 79-1, at 4.) Jurriaans disputed McClendon's findings at the meeting but says she was not allowed to provide rebuttal information. (Doc. # 79-3, at 139, 142; Doc. # 87-12, at 3.)

On June 20, 2016, Windham emailed Jurriaans with instructions to meet him the next week. He warned her that her job was on the line: "I am contemplating the

continuation of your employment as a County Extension Coordinator due to concerns that were shared with you during our meeting on May 26th." (Doc. # 79-1, at 23.) Jurriaans met with Windham and McClendon on June 27. At that meeting, Windham placed Jurriaans on paid administrative leave. (Doc. # 79-3, at 17, 23, 32, 137.)

Windham says he did not fire Jurriaans on June 27 because four days earlier, on June 23, Jurriaans complained to Auburn University about age discrimination. (Doc. # 79-1, at 5; Doc. # 79-4, at 64.) Then on July 13, Jurriaans filed a charge of age and gender discrimination with the EEOC. (Doc. # 87-11.) Only on August 31 — three weeks after Auburn found there was insufficient evidence of discrimination — did Windham fire Jurriaans. (Doc. # 79-1, at 5, 24–26; Doc. # 79-7, at 11–12.) The termination letter references the concerns about "job performance, deteriorating relationships between ACES' Talladega office and important funding and program partners in Talladega County, and the inability to foster a collegial, positive office environment." (Doc. # 93-1, at 1.)

### 6. *Jurriaans encountered problems with two grants.*

At this point, one might wonder why Kyle Kostelecky is a defendant. Here is why. In August 2015, Kostelecky joined ACES as the Assistant Director for Family and Consumer Sciences. Debra Ward and Isaac Chappell were two of the REAs he supervised. (Doc. # 79-8, at 12.) On February 17, 2016, Kostelecky emailed his

REAs — including Ward and Chappell — and imposed a moratorium on all federal grant applications. (Doc. # 79-8, at 72.) According to Kostelecky, there are good and bad ways to write a grant application, and he did not want his employees to submit a bad one. So until he could train the family and consumer sciences REAs on how to write a good application, none of them could apply for a federal grant. (Doc. # 79-8, at 25, 28.) This moratorium lasted for three-and-a-half to four months and applied only to Kostelecky's employees. (Doc. # 79-8, at 25, 27, 72.) It appears Kostelecky did not tell Jurriaans (who did not report to him) about the moratorium.

On March 31 and April 1, Jurriaans recruited Ward and Chappell to work on a federal mental health grant. (Doc. # 79-8, at 75.) Jurriaans wrote a proposal and started working on a budget. But on April 14, Kostelecky took Ward and Chappell off the project. "I do not recall approving any kind of request from you to be involved with this grant proposal," he emailed Ward and Chappell. "Please recall my February 17 email," he continued, reminding them that there was "still a grant activity moratorium." (Doc. # 79-8, at 76.) Jurriaans then quit working on the grant. Jurriaans admits she has "no idea" why Kostelecky took Ward and Chappell off the project. (Doc. # 79-4, at 21.) Kostelecky does not remember talking with Jurriaans about the matter. (Doc. # 79-8, at 12.) Windham denies talking with Kostelecky about "blocking" any grants. (Doc. # 79-3, at 29.) Kostelecky testified that he was unaware that enforcing his moratorium would undermine Jurriaans or make her look

bad. He recognized that it would lower her chances of receiving the grant, but he says that he did not think it would kill the project since Jurriaans could still work on it. (Doc. # 79-8, at 14–16.)[6] There is no evidence that failing to get the mental health grant was specifically held against Jurriaans.

Around this same time, a United States Department of Agriculture employee named Eddy May approached Jurriaans about a grant for raised garden beds. (Doc. # 79-4, at 21–22.) Jurriaans wrote the grant proposal, but then Eddy May suddenly put the project on hold. Jurriaans has "no idea" why the project was cancelled. (Doc. # 79-4, at 23–24; *see* Doc. # 87-6, at 4.)

## C.    <u>Procedural History</u>

Jurriaans filed this lawsuit in March 2017 after receiving a right-to-sue letter from the EEOC. (Docs. # 1, 79-2.) The Second Amended Complaint is the operative complaint. (Doc. # 36.) Three claims survived a motion to dismiss. First, Jurriaans may bring a claim under the Age Discrimination in Employment Act for injunctive (and other non-damages) relief against Lemme, Brown, McClendon, Windham, and Kostelecky in their official capacities.[7] Second, she may bring a Title VII gender-

---

[6] Jurriaans's attorneys exaggerate Kostelecky's testimony, even attributing to Kostelecky a statement that he did not make. (Doc. # 86, at 23.) Although the court "welcomes zealous representation, misconstruction of the record will not be tolerated." *United States v. Ramos*, 933 F.2d 968, 974 n.3 (11th Cir. 1991) (per curiam); *see* Fed. R. Civ. P. 11(b)(3).

[7] This claim cannot be based on a "pattern or practice" of discrimination; Jurriaans must establish intentional discrimination against herself in particular. (Doc. # 76.)

discrimination claim against ACES and Auburn University. Third, she may bring a Title VII retaliation claim against ACES and Auburn University. (Doc. # 60, at 3.)[8]

In October 2018, Defendants moved for summary judgment on all claims. (Doc. # 77.) Jurriaans then stated that she was "no longer pursuing her sex discrimination claim," having "refined her case down to wrongful age discrimination and wrongful retaliation." (Doc. # 86, at 43; *see* Doc. # 86, at 22.) Thus, the gender discrimination claim will be dismissed. The parties have fully briefed the remaining claims. (*See* Docs. # 78, 79, 86, 87, 91, 93, 99.)

## IV. DISCUSSION

The court is not "a super-personnel department." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (citation omitted). An employer may fire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, so long as its action is not for a discriminatory [or retaliatory] reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). And if an employer asserts a lawful reason for firing an employee, it is the employee's burden to show that the reason is pretext for discrimination or retaliation. *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1339 (11th Cir. 2015). Defendants proffer several legitimate reasons for firing Jurriaans. Because Jurriaans lacks evidence that those reasons are mere pretext for discrimination or retaliation,

---

[8] Jurriaans alleged retaliation in a November 2016 EEOC charge. (Doc. # 87-12.)

Defendants are entitled to summary judgment.

## A.     **Age Discrimination**

The Age Discrimination in Employment Act (ADEA) forbids employers from discriminating against employees who are forty years or older because of their age. 29 U.S.C. §§ 623(a)(1), 631(a).  For employers to be liable, the discrimination must be intentional, and it must be the "but-for cause" of an adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

### 1.     *There is no direct evidence of age discrimination.*

Age discrimination may be shown by either direct or circumstantial evidence. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013).  Jurriaans argues that she has direct evidence.  First, she points out that she was replaced by a man in his fifties. Second, she notes that her annual performance evaluations refer to her "experience" and expect her to "mentor" other employees.  Third, she references Lemme's four invitations to the August 2015 retirement planning meeting.  (Doc. # 86, at 27–30.) But none of that is direct evidence, and it is almost frivolous to argue otherwise.

"Direct evidence is evidence which, if believed, proves the existence of a fact without inference or presumption."  *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002); *see Walker v. Indian River Transp. Co.*, 741 F. App'x 740, 751 n.7 (11th Cir. 2018) (per curiam).  Based on that definition, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis

of age, constitute direct evidence." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (cleaned up); *see also Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017).  In one case, for example, the plaintiff's manager told him that "both of us had been around too long and were too old and were making too much money." *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1499 (11th Cir. 1991).  The same manager fired the plaintiff a few months later.  *Id.*  Yet the manager's remark was not direct evidence of discrimination; it was only circumstantial evidence since it was "ambiguous" and required the factfinder to infer discrimination.  *Id.* at 1501.[9]

Jurriaans would have direct evidence if she found a memo from Windham that instructed McClendon to "fire Wanda Jurriaans because she is too old."  *See Earley*, 907 F.2d at 1081.  But she has no such evidence.  Instead, the most she can say about her evidence is that it creates a "hint" or "inference" of discrimination.  (Doc. # 86, at 28–29.)  By definition, evidence that supports only an inference of discrimination is not direct evidence.  The court thus turns to Jurriaans's circumstantial case.

### 2. *Jurriaans has not presented a circumstantial case of discrimination.*

Courts may evaluate age discrimination claims under the familiar *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411

---

[9] Even in the main case that Jurriaans cites, the plaintiff lacked direct evidence.  *Skaggs v. Van Alstyne Indep. Sch. Dist.*, No. 16-cv-227, 2017 WL 77825, at *9 n.5 (E.D. Tex. Jan. 9, 2017).

U.S. 792, 807 (1973); *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). Under that framework, Jurriaans must first establish a prima facie case of age discrimination. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). If she does, Defendants must then proffer at least one legitimate, nondiscriminatory reason for their actions. *Id.* If they do, Jurriaans has the burden of presenting evidence that each of Defendants' proffered rationales is pretext for discrimination. *Id.* at 1024–25. Jurriaans fails at the third step.

"To make out a prima facie case of age discrimination," Jurriaans must show: "(1) that she was a member of the protected [age] group . . . ; (2) that she was subject to adverse employment action; (3) that a substantially younger person filled the position . . . from which she was discharged; and (4) that she was qualified to do the job for which she was rejected." *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999)). Jurriaans meets this test. She was seventy-three when she was fired, while her replacement was in his fifties. And for the purpose of her prima facie case, Jurriaans was qualified for the Talladega County CEC position. *See Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1299–1300 (11th Cir. 2015).

Because Jurriaans has made a prima facie case, Defendants must "articulate some legitimate, nondiscriminatory reason" for suspending and ultimately firing her. *McDonnell Douglas*, 411 U.S. at 802. Their explanations "must be legally sufficient

to justify a judgment" against Jurriaans. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). But Defendants "need not persuade the court that [they were] actually motivated by the proffered reasons." *Id.* at 254. It is enough simply to raise a genuine dispute of fact about whether they discriminated against her. *Id.*

Defendants have consistently offered three reasons for suspending and firing Jurriaans: (1) she had strained relationships with Talladega County officials; (2) she had poor relationships with colleagues; and (3) her performance was inconsistent. Each of these asserted reasons is legitimate and nondiscriminatory. *See Gamble v. Aramark Unif. Servs.*, 132 F. App'x 263, 266 (11th Cir. 2005) (per curiam) (holding "lack of interpersonal skills" was a legitimate, nondiscriminatory reason); *Chapman*, 229 F.3d at 1034 (holding an employer may rely on subjective personal qualities if it "articulates a clear and reasonably specific factual basis on which it based its subjective opinion"); *see also Kamenov v. Highwood USA*, 531 F. App'x 253, 255 (3d Cir. 2013) (treating "reluctance to mentor and train a colleague" as a legitimate, nondiscriminatory reason for firing an employee).

Because Defendants have proffered nondiscriminatory and legitimate reasons, there is no presumption that Defendants discriminated against Jurriaans. *Burdine*, 450 U.S. at 255. The question is instead whether each of the proffered reasons is pretext for discrimination. To be clear, "a reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real

reason." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (cleaned up). To show pretext, Jurriaans must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' proffered rationales that a jury "could find them unworthy of credence." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). This is required for each proffered reason. *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

### a. Jurriaans cannot show pretext by rehashing whether she was a good employee.

Jurriaans's main argument for pretext is that she was, in fact, good at her job. She presents evidence that several citizens of Talladega County supported her (Docs. # 87-2, 87-3, 87-4), emphasizes the positive comments in her evaluations (Doc. # 86, at 21, 38), and stresses that everyone McClendon interviewed found something nice to say about her (Doc. # 79-7, at 20–24). The former Autauga County CEC thought that Jurriaans did a good job. (Doc. # 87-1, at 2.) And Jurriaans's temporary fill-in assistant supposedly liked working with Jurriaans. (Doc. # 87-5, at 5.) But for five reasons, none of this establishes a genuine dispute about pretext.

First, Jurriaans is trying to relitigate the merits of her performance. That is

not allowed. It is not the court's job to find out if Jurriaans was a good employee; the question is whether Defendants were actually dissatisfied with her performance or whether that is mere pretext for discrimination. *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982). Jurriaans must meet Defendants' reasons "head on" without simply "quarreling" with the wisdom of those reasons. *Chapman*, 229 F.3d at 1030 ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."). Put another way, "the inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (cleaned up). It would not matter if those who complained about Jurriaans "were lying through their teeth" — so long as Defendants did not discriminate based on age. *Elrod*, 939 F.2d at 1470.

Second, Jurriaans does not rebut the rationale about her strained relationship with Talladega County officials. She does not claim that Windham fabricated the email complaint from Pat Lyle, that McClendon should have talked to different county officials, or that McClendon misrepresented the county officials' negative comments. She does not dispute that working closely with the county was an

important part of her job.  The most Jurriaans does is argue that McClendon sought out negative comments.  But that ignores the fact that Pat Lyle emailed Windham out-of-the-blue to complain about Jurriaans.  And as explained below, McClendon's investigation method does not show pretext.

Third, much of Jurriaans's evidence about her work performance is irrelevant. Defendants did not assert that Jurriaans was disliked by the general public.  Thus, affidavits from people who do not work for either ACES or the county (Docs. # 87-2, 87-3, 87-4) do not evidence pretext.  In addition, the opinions of non-supervisory colleagues — namely the former Autauga County CEC (Doc. # 87-1) and Jurriaans's fill-in assistant (Doc. # 87-5)[10] — are "close to irrelevant."  *Gamble*, 132 F. App'x at 266 (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)).  The question is whether Defendants were subjectively dissatisfied with Jurriaans, not how many people concurred in their assessment.  *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1354 (11th Cir. 1999) (per curiam) (holding opinions of non-decisionmakers about the plaintiff's qualifications created no genuine dispute about pretext); *cf. Hornsby-Culpepper*, 906 F.3d at 1315 (similar).

Fourth, Defendants never claimed that Jurriaans was all bad all the time.  They

---

[10]  Defendants move to strike the fill-in assistant's statement since there is no indication it was made under oath.  (Doc. # 90, at 6 n.2.)  Jurriaans did not respond to that objection.  (*See* Doc. # 100.)  Because the statement was not made under penalty of perjury, it is inadmissible.  *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305–06 (5th Cir. 1988); *Rogers v. City of Selma*, 178 F. Supp. 3d 1222, 1232 (S.D. Ala. 2016).  The motion to strike is therefore due to be granted in part.

readily admitted that she had positive attributes and a history of success. They also admitted that no one is perfect. Rather, Defendants said, the negatives outweighed the positives. (Doc. # 79-3, at 12, 20; Doc. # 79-5, at 12; Doc. # 79-6, at 12, 14.) And as for inconsistency, Lemme stated: "Being inconsistent on a daily basis as we all function as humans is different than getting a performance evaluation below expectations because of inconsistency." (Doc. # 79-6, at 14.) That distinction is a judgment call about how much inconsistency to tolerate, and the fact that Jurriaans disagrees with how Defendants made that call does not show pretext. *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per curiam) ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance.").

Fifth, Jurriaans seems to admit underlying facts for some criticisms, and she does not claim McClendon concocted the other accusations. For example, Jurriaans admits that REAs did not use the Talladega County office as their home base. (Doc. # 79-4, at 13.) McClendon took that as evidence that REAs worked around Jurriaans and avoided the office. Jurriaans also admits that an ACES employee started crying during a meeting, and Jurriaans says she "apologized" to that employee afterwards. (Doc. # 79-4, at 8; Doc. # 87-6, at 6.) This supports the criticism that Jurriaans had poor communication skills. That Jurriaans says she was willing to learn from that incident is irrelevant. If Defendants did not discriminate based on age, their refusal

to give Jurriaans a second chance does not matter.

### b. The comments in Jurriaans's evaluations were not "ageist."

Jurriaans argues that Windham made "ageist" comments in her 2014 and 2015 performance evaluations. These comments include:

- "Wanda is an ACES employee with abundant skills and experience in most all areas of work related to the CEC assignment. Given her abilities, experience, and knowledge — she could mentor, lead, and foster most any program and effort that is appropriate to ACES' mission. Further, she could be an excellent asset to less seasoned employees and those struggling with various areas of their job. This has not happened however to an appropriate level that is becoming of her experience and abilities." (Doc. # 79-4, at 68.)

- "Give her CEC level of . . . III, she is not catalytic in fostering or embracing new and innovative programming, as much as she could be given her level of experience. Given her talents and the resources available to her, programmatic efforts and professionals seeking to implement programs should be lining up to work with Talladega County. Being more embracing of innovation, seeking to be a catalytic leader, and displaying a mentoring posture related to new and relevant ideas would enhance this Job Area greatly for her and her County." (Doc. # 79-4, at 72.)[11]

- "Wanda has many Community Partners and fosters relevant programs with their input and help. This area could be taken to a higher level if less seasoned professionals could be catalytically involved at a higher level in new and innovative efforts." (Doc. # 79-4, at 73.)

- "Given Wanda's level of experience and talents, she could easily be recognized regionally and beyond as a face of ACES. This is not the case primarily due to a lack of an innovative approach to leadership and programming, thus impact is lower than it should be.

---

[11] CEC Tier III is the highest level of a "career ladder matrix." (Doc. # 79-5, at 40.)

Due to this perception — ambassadorship is not recognized at a high level." (Doc. # 79-4, at 73.)

- "Wanda seeks evaluation input of sponsored programs and programs she has directed to an above average level.  However — this same level of outreach could be taken to a higher level related to new and innovative programming." (Doc. # 79-4, at 76.)

- "Basic improvement could be attained very quickly thru an open and proactive willingness to work with all ACES personnel in a mentoring and nurturing fashion, sustain traditional and proven programming while being willing to try new/innovative programming efforts, and be mindful that proving impact to County citizens and stakeholders will enhance her image, success, and consequently the success and image of ACES in Talladega County." (Doc. # 79-4, at 68.)

- "Embracing this challenge, utilizing her experience to a higher level, and communicating with and mentoring younger agents in a more nurturing fashion would greatly enhance this area." (Doc. # 79-1, at 15.)

Jurriaans is right that ageist comments may be evidence of pretext.  *See, e.g.*, *Damon*, 196 F.3d at 1362.[12]   But again, the issue is whether the proffered reasons for firing Jurriaans are both false and a guise for discrimination.  *Flowers*, 803 F.3d at 1339. Defendants' rationales are not automatically unworthy of credence because Jurriaans subjectively interpreted Windham's remarks as ageist.  The court instead

---

[12]  In one case, for example, it was ageist to tell an employee that she would be "put . . . out to pasture."  *Godwin v. WellStar Health Sys., Inc.*, 615 F. App'x 518, 530 (11th Cir. 2015) (per curiam).  In another case, it was ageist to refer to older employees as "geriatrics" and "dead wood." *Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1230 (11th Cir. 2004).  Several cases affirm it is ageist to call an employee "old man."  *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476 (5th Cir. 2015); *Ashe v. Aronov Homes, Inc.*, 354 F. Supp. 2d 1251, 1256 (M.D. Ala. 2004).  And it is ageist to say that an employee is "too old."  *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 313, 315 (5th Cir. 2004); *Alphin*, 940 F.2d at 1500.

examines the "substance, context, and timing" of the comments. *Lucas v. U.S. Atty. Gen.*, 467 F. App'x 854, 858 (11th Cir. 2012) (per curiam) (quoting *Damon*, 196 F.3d at 1362); *Bonham v. Regions Mortg., Inc.*, 129 F. Supp. 2d 1315, 1332 (M.D. Ala. 2001); *cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) ("The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage.").

It is unreasonable to view the statements in Jurriaans's evaluations as showing bias against older employees. First, references to Jurriaans's "experience" were not negative. Windham was holding Jurriaans to a standard commensurate with her ability, and he thought she fell below that standard. Her experience was the reason for her ability, not an explanation for her poor performance. Nor are the references to "new and innovative" approaches ageist. Practically every organization must, at some point, adopt "new and innovative" approaches. The ADEA does not ban employers from wanting their employees to be innovative, and older employees can develop new approaches, too. Just because innovation "is linked by stereotype" to youth does not mean that Defendants "cannot search for and consider" innovation "independently from the stereotype." *Chapman*, 229 F.3d at 1036. And Jurriaans was expected to be the ACES liaison in Talladega County — in common parlance, to be the "face" of ACES. The reference about her "image" cannot reasonably be construed as a comment about her age or physical appearance; it was a synonym for

her reputation.  In short, Jurriaans insists that Windham used discriminatory "code words" but ignores that Defendants have legitimate interests in traits like mentorship and innovation.  *See Hamilton v. Sheridan Healthcorp Inc.*, 602 F. App'x 485, 488 (11th Cir. 2015) (per curiam) (finding remarks were not discriminatory).

Windham also gave Jurriaans her performance evaluations in February 2015 and January 2016.  That was before Pat Lyle complained about Jurriaans and before McClendon's investigation.  Jurriaans was not placed on paid administrative leave until June 2016, and she was not fired until August 2016.  Thus, Windham's remarks do not indicate pretext.[13]  *Cf. White v. Winn Dixie*, 741 F. App'x 649, 659 (11th Cir. 2018) (per curiam) (affirming summary judgment for an employer despite discriminatory remarks); *Chambers v. Fla. Dep't of Transp.*, 620 F. App'x 872, 875, 877 (11th Cir. 2015) (per curiam) (same); *Scott*, 295 F.3d at 1230 (same).

Finally, when Windham made these allegedly ageist comments, he was in his late fifties and thus well within the class of people protected by the ADEA.  In fact, every individual Defendant is protected by the ADEA:  Lemme was born in 1951, Windham in 1957, Brown in 1959, Kostelecky in 1961, and McClendon in 1968. (Doc. # 79-6, at 4; Doc. # 79-3, at 6; Doc. # 79-5, at 4; Doc. # 79-8, at 4; Doc. # 79-

---

[13]  The same goes for Brown.  Sometime between 2013 and 2015, Brown was on a search committee for an Assistant Director of Family and Consumer Sciences, the position later filled by Kyle Kostelecky.  "There were discussions" on the committee "that some of the candidates interviewed were older and might retire after only a few years."  (Doc. # 87-9, at 4.)  This does not create a genuine dispute about pretext because it is too far removed from Jurriaans's termination.

7, at 4.) This poses a "difficult burden" for Jurriaans because Defendants "are more likely to be the victims of age discrimination than its perpetrators." *Vahey v. Philips Elecs. N. Am. Corp.*, 461 F. App'x 873, 875 n.5 (11th Cir. 2012) (per curiam) (quoting *Elrod*, 939 F.2d at 1471).

### c. Lemme's invitations to the retirement planning meeting do not show pretext.

Just as Windham's comments do not show pretext, neither do Lemme's four invitations to the August 2015 retirement planning meeting. Jurriaans does not claim that Lemme expressly told her to retire. Instead, she says that he was "adamant" that she attend the meeting. In her initial complaint to the EEOC, Jurriaans claimed that the meeting itself "sent a strong message" that she should retire. (Doc. # 87-11, at 3.) Now she says Lemme's invitation was a "hint" that she should retire and that he was "encouraging [her] about retirement." (Doc. # 86, at 28–29; Doc. # 87-6, at 2.)

Yet the retirement planning meeting was five months before Jurriaans's 2015 performance evaluation, ten months before she was placed on leave, and a full year before she was fired. Jurriaans also lacks evidence to dispute Lemme's testimony that he invited "everyone" and that a range of ages attended. Jurriaans has no evidence that Lemme was disproportionately adamant when he invited older CECs. Lemme was about sixty-four at the time. So even though Jurriaans thought Lemme was being ageist, the context, substance, and timing of his invitations do not suggest pretext. *See White*, 741 F. App'x at 659; *Chambers*, 620 F. App'x at 877.

Nor is retirement an off-limits topic for employers and employees. Lemme has a legitimate interest in taking care of his employees, including ensuring that they get information about financial planning. Indeed, Lemme might have been allowed to directly ask Jurriaans about her retirement plans. *See Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct."); *see also Ng-A-Mann v. Sears, Roebuck & Co.*, 627 F. App'x 339, 343 (5th Cir. 2015) (per curiam) (stating a "reasonable inquiry" into an employee's "future plans" about retirement is not discriminatory); *Rexses v. The Goodyear Tire & Rubber Co.*, 401 F. App'x 866, 869 (5th Cir. 2010) (per curiam) ("An employer's inquiry into an employee's age and retirement plans is not by itself evidence of discriminatory intent.").

### d. Claims of unfair treatment do not show pretext here.

Jurriaans argues in various ways that she has been treated unfairly. But in the end, those arguments do not create a genuine dispute about pretext.

If Defendants deviated from their normal investigative protocols, that could be evidence of pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006); *see Knight v. Fla. Dep't of Transp.*, 291 F. App'x 955, 959 (11th Cir. 2008) (per curiam) ("No doubt evidence an investigation was perfunctory or capricious *in comparison to other investigations* would indeed be evidence the

investigation was not conducted in good faith.") (emphasis added). But to suggest pretext, procedural inadequacies must be discriminatory. If investigations are unfair to both young and old employees, the unfairness is not because of discrimination. There is no evidence that McClendon's investigation of Jurriaans differed from the investigation of any other employee. *See Simmons v. Bd. of Regents*, 523 F. App'x 712, 713 (11th Cir. 2013) (per curiam). Nor is there evidence that the investigation violated an ACES policy — much less that a policy was violated in a discriminatory manner. *See Rojas v. Florida*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002) (per curiam) ("To establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner."); *Mitchell*, 186 F.3d at 1355–56 ("Standing alone, deviation from . . . policy does not demonstrate discriminatory animus."). Instead, Jurriaans presumes that McClendon was trying to cover up discrimination, and thus she thinks that unfairness must have resulted from discrimination. That puts the cart before the horse. *See Holifield*, 115 F.3d at 1565 (rejecting as "unsubstantiated" an "assertion that the defendants began documenting an untrue assessment of [the plaintiff's] performance in order to terminate him because of his race").

In addition, McClendon was not investigating a discrete historical event. Her investigation looked at Jurriaans's overall performance, including how she got along with her colleagues. (Doc. # 79-3, at 119; *see* Doc. # 79-1, at 4; *cf.* Doc. # 79-3, at 11; Doc. # 79-5, at 17.) McClendon asked delicate questions without giving

Jurriaans notice — telling interviewees that she would keep their answers "discreet to the extent possible" and asking them not to discuss the interview with others — but that was a reasonable approach. Maybe it allowed "backstabbing," as Jurriaans says it did, but it might have also allowed people to speak freely. And though telling the interviewees that she was conducting "an investigation" into Jurriaans potentially primed them into criticizing Jurriaans, it is mere speculation to say that McClendon deliberately sought out negatives. Jurriaans does not present evidence from anyone who talked to McClendon. Nor is there cognizable evidence suggesting McClendon misrepresented criticisms, had reason to know that anyone made false accusations, or had reason to know that someone was biased against Jurriaans.

In the end, Jurriaans is simply disputing how much weight Defendants should have given to the critics. Yet Jurriaans was free to send a response to McClendon anytime in the three months between learning of the investigation and getting fired. And if Defendants honestly decided to side with Jurriaans's critics, then they did not violate the ADEA. The material issue is discrimination, not fairness. *See Damon*, 196 F.3d at 1361 ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

Jurriaans also argues that Kim Good, the 4-H REA in Talladega County, is really to blame for 4-H's lack of success. The court assumes that Jurriaans is right,

but the question is whether Defendants believed that Jurriaans was at fault. Plus, Jurriaans cannot use Good as a comparator because there is no evidence about Good's age and no evidence anyone complained about Good. *See Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019) (en banc) (noting comparators ordinarily "will have engaged in the same basic conduct (or misconduct) as the plaintiff" and "will share the plaintiff's employment or disciplinary history").

###### e. Kostelecky's grant moratorium does not show pretext.

Jurriaans claims that Kostelecky undermined her ability to do her job, in turn making her vulnerable to being fired. (Doc. # 86, at 23–24.) But there is no evidence to support that claim. Kostelecky did not "block" Jurriaans's grants; he only told his subordinates not to apply for any federal grants. That moratorium did not apply to Jurriaans; she was free to apply for any grant she chose. There is no evidence that Kostelecky selectively enforced his moratorium against the REAs who worked with Jurriaans. Jurriaans speculates that Kostelecky was motivated by discrimination, but that is not enough. *See Mosley v. MeriStar Mgmt. Co.*, 137 F. App'x 248, 251 (11th Cir. 2005) (per curiam) ("[A] personal belief, unsupported by other evidence, does not suffice to establish pretext."); *Bald Mtn. Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment."). Nor is there evidence Defendants cared about Jurriaans's failure to get the mental health grant.

### f.     Other complaints about discrimination do not show pretext.

Finally, Jurriaans argues that there is a "habit or practice" of discrimination at ACES.  (Doc. # 100, at 31.)  She does so by presenting five charges of discrimination filed with the EEOC, each accompanied by an affidavit.[14]  These allegations, though, do not defeat summary judgment.

One affidavit is from the former Autauga County CEC, who alleges Windham discriminated against her based on race.  (Doc. # 87-1, at 5.)  But this case does not involve race discrimination, so that affidavit is irrelevant.  *See Hornsby-Culpepper*, 906 F.3d at 1313 (holding in a case about race and gender discrimination that it was "irrelevant" that the plaintiff's superior was accused of sexual harassment by other employees).  The affidavit is also conclusory, lacking specific factual allegations. *See Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.").

The other affidavits come from REAs who worked under Kyle Kostelecky. All four worked on family and child development programs (within the family and consumer sciences field), and they claim that Kostelecky discriminated against them

---

[14]  These charges relate to other cases filed in this district by Jurriaans's attorney. *See Allen v. Ala. Coop. Extension Sys.*, No. 18-cv-1027 (M.D. Ala. filed Dec. 7, 2018); *Odom v. Ala. Coop. Extension Sys.*, No. 18-cv-797 (M.D. Ala. filed Sept. 12, 2018); *Bowens-Thomas v. Ala. Coop. Extension Sys.*, No. 16-cv-621 (M.D. Ala. filed July 28, 2016).

based on age. They assert that younger REAs received higher bonuses, that family and child development REAs are expected to cover too large a geographical area, and that Kostelecky was a miserable boss. They also allege that ACES once intended to house all family and consumer sciences REAs at Auburn University, which could have required REAs to move to Auburn. This was supposedly designed to weed-out older employees, but the plan was later cancelled. (Docs. # 87-8, 87-9, 87-10, 99-1.)

None of this affected Jurriaans, who was not an REA and who did not report to Kostelecky. There is no evidence Kostelecky investigated older REAs or gave younger REAs better performance evaluations. Nor is there any evidence showing that Jurriaans was paid less than younger CECs. There is no evidence that anyone besides Kostelecky mistreated older REAs.[15]

So in the end, no reasonable jury could find that Defendants' proffered reasons for firing Jurriaans are pretextual. *See Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1350 (11th Cir. 2007) (per curiam) (affirming summary judgment when the plaintiff had not "provided 'sufficient evidence to find that the employer's asserted justification is false'") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*,

---

[15] Lemme and Brown were involved in the plan to move the family and consumer science REAs to Auburn, and Brown is the one who told the family and child development REAs that they would be responsible for a large geographical area. (Doc. # 87-8, at 6–7; Doc. # 87-9, at 9–11; Doc. # 87-10, at 6–7; Doc. # 99-1, at 6.) But there is no evidence that younger REAs were exempt from those changes, and Defendants did not take similar actions against Jurriaans.

530 U.S. 133, 148 (2000)); *Chapman*, 229 F.3d at 1037 (same; the plaintiff "did not produce sufficient evidence to create a genuine issue of pretext"); *see also Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1321 (11th Cir. 2014) ("If the non-movant's evidence is merely colorable or not significantly probative, summary judgment may be granted.") (cleaned up).

### 3. *Jurriaans has no "convincing mosaic of circumstantial evidence."*

Because the *McDonnell Douglas* burden-shifting framework is not required, Jurriaans would survive summary judgment if she presented circumstantial evidence that created a genuine dispute about Defendants' intent. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *see id.* ("A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.") (cleaned up).  But for the same reasons that Jurriaans fails under the burden-shifting framework, she fails to present a convincing mosaic that would allow a jury to find intentional discrimination.

## B.  Retaliation

In addition to her age discrimination claim, Jurriaans claims that Defendants retaliated against her because she filed complaints with Auburn University and with the EEOC.  Like her ADEA claim, this retaliation claim ultimately requires proof of but-for causation. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)

("[A] plaintiff must prove that had she not complained, she would not have been fired."); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). The pretext inquiry also applies, so Jurriaans bears the ultimate burden of proving each reason proffered by Defendants is a pretext for retaliation. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

Jurriaans bases her retaliation claim on her June 23, 2016, complaint to Auburn and her July 13, 2016, charge to the EEOC. (Doc. # 86, at 19, 23, 27, 44–46.)[16] Yet by then, the process of firing Jurriaans was underway. Windham told Jurriaans on June 20 that he was thinking about firing her. (Doc. # 79-1, at 23.) Defendants did not fire her until after Auburn reported that there was insufficient evidence of discrimination. (Doc. # 79-1, at 24–26.) Defendants fired her based on the reasons discussed above, and Jurriaans has not shown evidence that those reasons are pretextual. In short, no reasonable jury could find that Jurriaans would not have been fired but for the fact that she complained. *See Saffold v. Special Counsel, Inc.*, 147 F. App'x 949, 951 (11th Cir. 2005) (per curiam) ("When an employer makes a tentative decision *before* protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation."); *see also Clark Cty.*

---

[16] On February 9, 2016, Jurriaans told Windham that her 2015 performance evaluation "gave [her] a feeling that age and years of service were the focal point for the evaluation." (Doc. # 79-3, at 155.) Jurriaans does not try to base her retaliation claim on this statement.

*Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [adverse actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Trask*, 822 F.3d at 1194 (holding "the plaintiffs' protected activity could not have been a but-for cause of their reassignment" because the reassignment decision was made before the plaintiff's protected activity). And there is no evidence that Jurriaans was fired sooner because of her complaints. *See Alvarez*, 610 F.3d at 1270.

## V. CONCLUSION

For the reasons above, it is ORDERED that:

1. Defendants' Motion for Summary Judgment (Doc. # 77) is GRANTED.

2. Defendants' Objection and Motion to Strike Affidavits and Other Evidence (Doc. # 90) is GRANTED to the extent provided in this Order.

A separate Final Judgment will be entered.

DONE this 26th day of June, 2019.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE